IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CAPITALSOURCE FINANCE LLC          :

                                    :

      v.                         : Civil Action No. DKC 2004-3739

                                    :

B&B CONTRACTORS, INC.              :

                                    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this diversity case are a motion by Defendant B&B Contractors, Inc. to dismiss for lack of personal jurisdiction, or, in the alternative, for transfer (Paper 6) and a motion by Plaintiff CapitalSource Finance LLC for leave to file a surreply (Paper 15).[1] The issues have been fully briefed and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the court will deny Plaintiff's motion for leave to file a surreply, deny Defendant's motion to dismiss, and grant the motion to transfer.

**I.   Background**

    **A.   *Factual Background***

The following facts have been alleged by Plaintiff CapitalSource Finance LLC.  On October 9, 2001, Defendant B&B

---

[1] Plaintiff initially filed a surreply without leave of court (paper 13), which the court directed the clerk to reject from the electronic filing system.  Thus, Defendant's motion to strike the surreply (paper 14) is moot.

Contractors, Inc. contracted with Prestige Resort Development, LLC ("Prestige") to be the general contractor on a construction project Prestige was developing at Big Bear Lake, California.[2] On July 14, 2003, Plaintiff, a commercial finance company, entered into a Construction Loan and Security Agreement ("Construction Loan Agreement") with Prestige to provide additional financing for the project.   At the same time, Plaintiff entered into a Collateral Assignment of Construction Contract ("Assignment Contract") with Prestige and Defendant.

The effect of the Assignment Contract was, *inter alia*, to assign all of Prestige's benefits under the General Contract as "additional security for the obligations incurred and to be incurred" by Plaintiff pursuant to the Construction Loan Agreement.  *See* Paper 2, Ex. 2, § 3.  In section 1 of the Assignment Contract, Defendant represented that it had executed and delivered five separate contracts and/or agreements that collectively comprised the General Contract, and that other than those five, "[t]here exist no other agreements, amendments or understandings to which the Contractor [Defendant] is a party relating to the Contract." *Id.*, Ex. 2, § 1.  In addition to the representations Defendant made in the Assignment Contract,

---

[2] The construction contract entered into between Defendant and Prestige will be referred to as "the General Contract."

Defendant and Prestige both agreed that no change order involving an increase or decrease in the cost of the work required by the General Contract above a certain value ($25,000.00 for one change order or $100,000.00 in the aggregate) would be effected "without the prior written consent of" Plaintiff. *Id.*, Ex. 2, § 6.2.

On September 30, 2003, Prestige and Plaintiff amended the Construction Loan Agreement to re-define certain terms. Shortly thereafter, Plaintiff discovered that, "contrary to Defendant [B&B's] representations in the Assignment Contract that there were no 'agreements, amendments or understandings' related to the Construction Project," there were more than sixty-five outstanding change orders, dating as far back as April 2002 and totaling approximately $1,450,000.00. Paper 2, ¶ 19. Plaintiff alleges that the existence of these outstanding change orders caused Prestige to be in default of the Construction Loan Agreement. Knowing that Prestige would need additional financing in order for Defendant to receive payment for the outstanding change orders, Defendant and Prestige entered into a Change Order Payment Agreement ("Change Order Agreement"), setting forth the terms for payment of the approximately $1.45 million in outstanding change orders. The Change Order Agreement also provided that, other than the recently revealed

3

change orders, "[Defendant] and Prestige know of no outstanding change orders" related to the construction project. *See id.*, Ex. 4.

Plaintiff alleges that the Change Order Agreement, which Prestige and Defendant entered into at the express direction of Plaintiff, served as the basis for Prestige's request for additional financing from Plaintiff and was the reason Plaintiff granted the additional funding request. On December 18, 2003, based on the Change Order Agreement between Prestige and Defendant, Prestige and Plaintiff amended the Construction Loan Agreement a second time by, *inter alia*, increasing the amount of the original loan by $1,250,640.00. *See id.*, Ex. 5, ¶ B.

On May 13, 2004, less than five months after representing in the Change Order Agreement that all outstanding change orders had been disclosed, Defendant filed eight mechanics' liens totaling $9.6 million in San Bernardino County, California for alleged work related to the Construction Project. Plaintiff alleges that the very act of filing mechanics' liens totaling $9.6 million demonstrates that Defendant's representations in the Change Order Agreement were false and misleading. It alleges that had it known that Defendant claimed millions of dollars in additional billings in July 2003 (when the Construction Loan Agreement was executed) or in December 2003

4

(when the Construction Loan Agreement was amended) Plaintiff would not have entered into any funding agreements with Prestige.

### B.   *Procedural Background*

On October 22, 2004, Plaintiff filed suit in the Circuit Court for Montgomery County against Defendant, alleging multiple counts of fraud and negligent misrepresentation, as well as breach of contract.  Specifically, it alleges that Defendant knowingly and willfully made several false representations in the Assignment Contract and the Change Order Agreement regarding the existence (or lack thereof) of change orders with the purpose of inducing Plaintiff to enter into a funding agreement with Prestige.  It also alleges that Defendant breached the Assignment Contract by executing change orders without prior written consent from Plaintiff.

After removing the case to this court pursuant to 28 U.S.C. § 1441(a), Defendant filed the present motion to dismiss for lack of personal jurisdiction.  Alternatively, Defendant requests that this action be transferred to the United States District Court for the Central District of California.  Because the question of whether the court can constitutionally exercise *in personam* jurisdiction over Defendant is at best a close one, in the interest of justice and for the convenience of the

parties and witnesses, the court will deny Defendant's motion to dismiss, but grant the motion to transfer.

## II.  Motion for Leave to File Surreply

Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed.  Local Rule 105.2(a).  Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply.  *See Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citing *Lewis v. Rumsfeld,* 154 F.Supp.2d 56, 61 (D.D.C. 2001)).  In its motion, Plaintiff does not identify any new matters presented by Defendant in its reply that would justify the court granting Plaintiff permission to file a surreply.  Rather, it respectfully "apologizes for th[e] inadvertent error" of filing a surreply without permission, and, now moves for leave to file.  Recognizing this, Defendant opposes Plaintiff's motion, arguing that "[t]he surreply is nothing more than [Plaintiff's] attempt to rehash arguments it made in its Opposition."  Paper 16 at 2.  The court agrees. Defendant did not raise any new issues or legal theories in its reply brief; it merely responded to arguments addressed by Plaintiff in its opposition.  Accordingly, Plaintiff's motion for leave to file a surreply is denied.

## III.     Standard of Review

When a court's power to exercise personal jurisdiction over a nonresident defendant is challenged by a motion under Fed. R. Civ. P. 12(b)(2), "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993)). If the existence of jurisdiction turns on disputed facts, the court may resolve the challenge after a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989). If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits and discovery materials, "the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Maryland*, 334 F.3d at 396; *see also Mylan Labs.*, 2 F.3d at 60; *Combs*, 886 F.2d at 676. In determining whether the plaintiff has proven a prima facie case of personal jurisdiction, the court "must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan,* 2 F.3d at 60; *Carefirst of Maryland*, 334 F.3d at 396.

A federal district court may exercise personal jurisdiction over a non-resident defendant "if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993). Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103, authorizes the exercise of personal jurisdiction to the limits permitted by the Due Process Clause of the Fourteenth Amendment. *See ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003); *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"* 283 F.3d 208, 212-13 (4th Cir.), *cert. denied*, 537 U.S. 822 (2002). Thus, "[the] statutory inquiry merges with [the] constitutional inquiry." *Carefirst Of Maryland*, 334 F.3d 390, 396-97 (citing *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135 (4th Cir. 1996)). Accordingly, the question for the court is whether the defendant purposefully established "minimum contacts" with Maryland such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)); *see also Burger King Corp. v.*

8

*Rudzewicz,* 471 U.S. 462, 474 (1985); *Base Metal Trading, Ltd.,* 283 F.3d at 213.

The crucial issue is whether the defendant's contacts with the forum state, here Maryland, are substantial enough that it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). A defendant has fair warning that it might be subject to a forum's jurisdiction if it purposefully directs its activities at forum residents and "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp.,* 471 U.S. at 472 (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984)). Where a nonresident defendant purposefully has engaged in significant activities within the forum state or has created "continuing obligations" with residents of the forum state, the defendant has obtained the benefits and privileges of conducting business there--and thus, "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King Corp.*, 471 U.S. at 476.

## IV. Analysis

Defendant has moved to dismiss Plaintiff's complaint on the grounds that its minimal contacts with the state of Maryland are insufficient to subject it to personal jurisdiction. Generally, the "nature of the claim and the defendant's contacts with the forum state determine whether a court may assert specific or general personal jurisdiction." *Johansson Corp. v. Bowness Constr. Co.*, 304 F.Supp.2d 701, 703 (D.Md. 2004). Specific jurisdiction may exist where the claim is related to or arises out of the defendant's contacts with the forum state. *See Helicopteros,* 466 U.S. at 414; *Johansson*, 304 F.Supp.2d at 703. General jurisdiction, however, may be asserted in a suit unrelated to the defendant's contacts with the forum state if the defendant maintains "continuous and systematic" contact with the state. *Helicopteros*, 466 U.S. at 414-15; *Johansson*, 304 F.Supp.2d at 703-04. However, "the threshold level of minimum contacts to confer general jurisdiction is significantly higher than for specific jurisdiction." *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997). Although Plaintiff argues that the court can exercise both specific and general jurisdiction over Defendant, the bulk of its opposition to Defendant's motion to dismiss is devoted to arguing that specific, rather than general jurisdiction, exists over Defendant. The court will, however, address both types.

### A.    *General Jurisdiction*

Plaintiff contends that Defendant has sufficiently "continuous and systematic" contacts with Maryland to justify this court's exercise of general *in personam* jurisdiction over Defendant.  For support, it offers no evidence of its own, but rather points to an admission by Defendant's founder, Executive Vice-President, and Chief Financial Officer Daniel Bergman in Defendant's supporting papers.   In his affidavit, Bergman states:

> Over the years, [Defendant] has had business relationships with various national retail, hospitality and/or food service chains outside of Maryland.   These business relationships were entered into in Chino, California, and periodically require [Defendant] to perform work in various states across the country, including Maryland.

Paper 6, Ex. 1 ("Bergman Aff.") ¶ 13.  Plaintiff contends that "while trying to minimize its presence in Maryland, Bergman admits that [Defendant] has performed work in Maryland and derived revenue from this state."  Paper 11 at 7.  However, this one statement, when read in context with the rest of Bergman's affidavit, does not demonstrate that Defendant maintains the kind of continuous and systematic contacts with Maryland that would permit a Maryland court to exercise general *in personam* jurisdiction over Defendant.

Although Plaintiff seizes upon this admission, the rest of Bergman's affidavit, which is uncontested by Plaintiff, reveals that Defendant's contacts with Maryland are not so continuous and systematic that it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.*, 444 U.S. at 297. Bergman attests that Defendant has never owned any real or personal property in Maryland; maintains no office or physical presence in Maryland; has no employees in Maryland; has never held any corporate meetings in Maryland; and has no on-going business relationships with any Maryland persons or Maryland entities. *See* Bergman Aff. ¶¶ 2-12. Moreover, Defendant has never advertised in Maryland; has never had a telephone listing in Maryland; has never opened a bank account in Maryland; has never rented any real property in Maryland; and has never filed any legal actions in Maryland. *Id*. Finally, Bergman attests that Defendant "does not seek out work in Maryland, it does not solicit work in Maryland and it does not bid on work in Maryland." *Id*. ¶ 16.

With respect to Bergman's statement, emphasized by Plaintiff, that Defendant has "periodically . . . perform[ed] work in various states across the country, including Maryland," Bergman attests that the work that was performed in Maryland involved "extremely small renovation projects," and that for

12

"several years during the relevant time period [it] performed no work at all in Maryland, including 2004." *Id.* ¶ 15. He further attests that the sporadic work performed by Defendant in Maryland was performed "solely at the direction of its out-of-state national clients pursuant to agreements reached with such clients out of state," and that, since 2000, the work performed by it in Maryland constituted approximately .0025% of its total income for the same period *Id.* ¶ 14. In light of the evidence put forth by Defendant, the court concludes that its contacts with Maryland are not sufficiently continuous, systematic, nor substantial enough to justify the exercise of general jurisdiction. *See Nichols v. G.D. Searle & Co.*, 991 F.2d 1195 (4th Cir. 1993) (holding that the district court in Maryland could not exercise general *in personam* jurisdiction even though Defendant employed thirteen Maryland residents as sales representatives, one Maryland resident as a district manager, possessed company cars registered in Maryland, held district meetings three times annually in Maryland, held regional and national meetings twice annually in Maryland, and had between $9 million and $13 million annual sales in Maryland); *see also Tyler v. Gaines Motor Lines, Inc.*, 245 F.Supp.2d 730, 734 (D.Md. 2003) (recognizing that "*Nichols* and the unfavorable light it casts upon broad constructions of general jurisdiction make it

difficult to find that general *in personam* jurisdiction can be maintained over [the defendant] in Maryland").

**B.   *Specific Jurisdiction***

Even if Defendant's contacts with Maryland are not sufficiently continuous and systematic to justify general jurisdiction, Plaintiff argues that specific jurisdiction may be exercised in this case because Defendant's "tortious and contractual conduct directed at [Maryland] forms the basis for the instant action." *See* Paper 11 at 3; *see also Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir. 2000) ("In the absence of continuous and systematic contacts, a court may still exercise *specific* personal jurisdiction when the contacts relate to the cause of action and create a substantial connection with the forum state."). To determine whether the exercise of specific jurisdiction comports with due process, a court considers (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." *See, e.g., Carefirst of Maryland*, 334 F.3d at 397; *Johansson Corp.*, 304 F.Supp.2d at 704. "A defendant has purposefully availed itself of the privilege of conducting activities in the forum state if the defendant has created a 'substantial

15

connection' to the forum." *Johansson Corp.*, 304 F.Supp.2d at 704 (citing *Ellicott Mach. Corp., Inc. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993)). "Phrased another way, the exercise of specific jurisdiction is consistent with the requirements of due process if 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Johansson Corp.*, 304 F.Supp.2d at 704 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297).

Applying these principles, the court cannot conclude that Defendant's conduct and connections with Maryland are such that it should reasonably anticipate being haled into court here. As the evidence submitted by the parties makes clear, Defendant did not purposefully avail itself of the privilege of conducting activities in Maryland; rather, any contact between Defendant and Plaintiff was the result of Plaintiff's decision to enter into a lending agreement in 2003 with Prestige, the developer of the project that Defendant had been the general contractor on since at least 2001. As Bergman attests, "In 2003, **Prestige informed [Defendant]** that Prestige had received a commitment for additional Project financing from Plaintiff . . . . Prior to that time, [Defendant] had never had any dealings or contacts with [Plaintiff] and **[Defendant] was not involved in any way**

16

**with Prestige's decision to obtain financing from [Plaintiff.]**"
Bergman Aff. ¶ 17 (emphasis added).  Thus, it is clear that
Defendant did not reach out to Maryland to solicit or form a
business relationship with Plaintiff, but rather Plaintiff was
brought to Defendant, either through Plaintiff's pursuit of
Prestige, or vice-versa.  Either way, it is undisputed that
Defendant did not initiate the business relationship between
itself and Plaintiff. *See Johansson Corp.*, 304 F.Supp.2d at 705
("One of the most important factors [in determining whether a
defendant purposefully established minimum contacts with the
forum] is 'whether the defendant initiated the business
relationship in some way.'") (quoting *Mun. Mortgage & Equity,
LLC v. Southfork Apartments Ltd. P'ship*, 93 F.Supp.2d 622, 627
(D.Md. 2000)); *see also Diamond Healthcare*, 229 F.3d at 451
(finding a lack of *in personam* jurisdiction where the in-state
plaintiff, rather than the out-of-state defendant, initiated the
business relationship).  In this case, "[t]he factor of whether
the defendant initiated the business relationship counsels
against the exercise of jurisdiction," because the relationship
was initiated by either Prestige, who had reached out to
Plaintiff, or by Plaintiff, who had reached out to Prestige, but
not by Defendant. *Johansson Corp.*, 304 F.Supp.2d at 706; *see
also Chung v. NANA Dev. Corp.*, 783 F.2d 1124, 1127 (4th Cir.

17

1986) ("The significant contacts considered are those actually generated by the defendant.")

In addition, the bulk of Plaintiff's complaint arises from what it alleges were various misrepresentations (or, omissions) in the Assignment Contract, the only contract between Plaintiff and Defendant.  *See* Paper 2 (counts I, II, IV, and VI). Defendant asserts, and Plaintiff does not dispute, that this contract was "received by [Defendant] from Prestige, was executed by [Defendant] at the request of Prestige and was delivered by [Defendant] to Prestige, all in California." Bergman Aff. ¶ 18.  Thus, the argument that these specific claims, as they relate to representations made in the Assignment Contract, arise out of Defendant's purposeful conduct directed at Maryland is simply unavailing.

However, once Defendant was aware that Plaintiff was the new lender on the project, and, consequently, began communicating with Plaintiff's employees located in Maryland, arguably it was at that point purposefully directing its activities at Maryland. In the complaint, Plaintiff makes the general allegation that after the Assignment Contract was entered into, Defendant "repeatedly made contact with Plaintiff in Maryland and caused tortious injury to the Plaintiff in Maryland." *See* Paper 2, ¶ 4. According to an affidavit attached to Plaintiff's opposition

18

brief, Defendant "repeatedly contacted" Maryland-based employees
of Plaintiff over an eight-month period "via e-mail, telephone
and facsimile."   Paper 11, Ex. 1 ("Rainero Aff.") ¶ 4.
Plaintiff alleges that through these means of contact, Defendant
made "misrepresentations related to the Assignment Contract and
Change Order Agreement inducing Plaintiff to lend [additional]
money to Prestige . . . for payment to [Defendant.]" *Id.*, ¶ 9.
It is these alleged misrepresentations that serve, in part, as
the basis for counts III and V of Plaintiff's complaint.[3]  Thus,
these claims arguably do arise out of Defendant's activities
directed at Maryland.  At that point, Defendant knew, or should
have known, that it was dealing with a company located in

---

[3] It is important to note, however, that other than the
general allegation that "Defendant has repeatedly made contact
with Plaintiff in Maryland and caused tortious injury to the
Plaintiff in Maryland," the complaint is silent as to alleged
misrepresentations made to Plaintiff via e-mail, phone
communications, and facsimiles. Paper 2, ¶ 4.  In fact, in both
count III and count V, the two counts that involve the extension
of additional financing to Prestige, the complaint alleges that
the misrepresentations that induced Plaintiff to provide the
additional funding were made in the Change Order Agreement
between Prestige and Defendant.  *See id.*, ¶¶ 50-56, 64-70.
There simply are no specific allegations in the complaint that
the communications and contacts between Defendant and Plaintiff
induced the latter to provide additional funding; rather the
complaint is replete with allegations that the sole reason the
additional funds were provided  was the representations made in
the Change Order Agreement. *See id.*, ¶¶ 21, 23, 26, 27, 29, 34,
50-56, 64-70.

Maryland and, thus, that its communications with that company were directed at Maryland.

However, "[t]he fundamental question to be answered in deciding the constitutional issue is whether it can be said that [Defendant] 'purposefully avail[ed] itself of the privilege of conducting activities within' Maryland." *Joseph M. Coleman & Assocs., LTD. v. Colonial Metals*, 887 F.Supp. 116, 119 (D.Md. 1995) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Even assuming Plaintiff's factual allegations regarding phone calls and e-mail transmissions are true, whether that fundamental question can be answered in the affirmative, so that "it is presumptively not unreasonable to require [Defendant] to submit to the burdens of litigation in [Maryland]" is, in the court's judgment, at best a close call. *See Burger King Corp.*, 471 U.S. at 476.

However, there is a narrower ground of decision available. Defendant has moved in the alternative to transfer this case to the United States District Court for the Central District of California where the court would undoubtedly have *in personam* jurisdiction over Defendant. As the foregoing analysis indicates:

> The constitutional question is a close one upon which reasonable minds could differ. In [the court's] judgment, there is no

20

> reason to interject such a question into the
> case unnecessarily.  It would not be in the
> interest of any of the parties or any of the
> witnesses to litigate this case in Maryland,
> only to have a ruling upholding the
> assertion of jurisdiction over [Defendant]
> reversed on appeal.

*Joseph M. Coleman*, 887 F.Supp. at 120; *see also Tyler*, 245

F.Supp.2d at 734 ("Because the [personal jurisdiction] question

is a close one, [the court] will exercise [its] discretion to

transfer this case in the interests of justice."); *The Harry &*

*Jeanette Weinberg Found. Inc. v. ANB Inv. Mgmt. & Trust Co.*, 966

F.Supp. 389, 392 (D.Md. 1997) (exercising the discretion to

transfer case because "the statutory construction and the

constitutional issues" with respect to exercising personal

jurisdiction over the defendant were "close ones").  Moreover,

in addition to the constitutional concerns surrounding the

court's ability to exercise *in personam* jurisdiction over

Defendant, other factors exist which counsel in favor of

transferring this case to the United States District Court for

the Central District of California.

Section 1404(a) provides: "For the convenience of parties

and witnesses, in the interest of justice, a district court may

transfer any civil action to any other district or division

where it might have been brought."  28 U.S.C. § 1404.  To

prevail on a motion to transfer venue under § 1404, "the

21

defendant must show by a preponderance of the evidence that the proposed transfer will better and more conveniently serve the interests of the parties and witnesses and better promote the interests of justice." *Helsel v. Tishman Realty Constr. Co., Inc.,* 198 F.Supp.2d 710, 711 (D.Md. 2002) (internal quotation omitted); *see also Lynch v. Vanderhoef Builders*, 237 F.Supp.2d 615, 617 (D.Md. 2002). In order to satisfy this burden, the defendant should submit, for example, affidavits from witnesses and parties involved that explain the inconvenience and hardship they "would suffer if the case were heard in the plaintiff's chosen forum." *Dow v. Jones*, 232 F.Supp.2d 491, 499 (D.Md. 2002) (citing *Helsel*, 198 F.Supp.2d at 712). Mere assertions of inconvenience or hardship, without more, are insufficient to sustain a motion to dismiss or to transfer pursuant to § 1404(a). *See Dow*, 232 F.Supp.2d at 499; *Helsel*, 198 F.Supp.2d at 712.

In deciding a motion to transfer venue under § 1404(a), the court must "weigh in the balance a number of case-specific factors." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). The host of convenience factors a court should consider include:

> (1) the plaintiff's choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling

22

> witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws.

*Brown v. Stallworth*, 235 F.Supp.2d 453, 456 (D.Md. 2002) (quoting *Choice Hotels Int'l, Inc. v. Madison Three, Inc.*, 23 F.Supp.2d 617, 622 n.4 (D.Md. 1998) (internal citations omitted)).  The decision whether to transfer venue is committed to the sound discretion of the trial court.  *See Brock v. Entre Computer Centers, Inc.*, 933 F.2d 1253, 1257 (4th Cir. 1991); *see also Stewart*, 487 U.S. at 29 (stating that § 1404(a) intended "to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness'") (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

Given the substantial connections this case has with California as compared to the tenuous connections with Maryland, the court will exercise its discretion to transfer this case to the United States District Court for the Central District of California.  As Defendant correctly points out, the essence of

23

this case is the allegation by Plaintiff that Defendant failed to disclose the existence of certain change orders relating to work performed on a California construction project and that Defendant performed certain change order work without first notifying and obtaining approval from Plaintiff.  Accordingly, there will be factual questions regarding the existence and nature of the change orders at issue, when they were agreed to, what they were for, and whether they were subject to disclosure. Moreover, factual issues regarding what Plaintiff was told by Defendant, Prestige, and Plaintiff's on-site inspector will be critical to the questions of  what, if any, misrepresentations were made, and whether, based on what it knew, it was reasonable or justifiable for Plaintiff to rely on Defendant's statements. As Defendant contends, "All of these issues will involve investigation, inspection and discovery relating to persons and documents located in California."  Paper 6 at 17.

In addition, aside from Plaintiff's own representatives, two of whom it identifies in its opposition, the potential witnesses in this case reside outside of Maryland.  Defendant has submitted affidavits identifying a plethora of witnesses with information relevant to this case, the bulk of whom reside in California.  *See* Bergman Aff., Ex. A; Paper 12, Ex. 1 ("Pearce Aff.").  Although it is doubtful that every one of the many

24

witnesses Defendant identifies is "pivotal" to its case,
Defendant does identify some individuals whose testimony would
certainly be "necessary" and "key" to its defense, and it
provides "a general statement of what their testimony will
cover." *See Xpressions Footwear Corp. v. Peters*, 885 F.Supp.
630, 633 (S.D.N.Y. 1995) (explaining that when a motion to
transfer venue is based on convenience of the witnesses, the
movant "must clearly specify the key witnesses to be called" and
"make a general statement of what their testimony will cover");
*see also Cronos Containers, Ltd. v. Amazon Lines, Ltd.*, 121
F.Supp.2d 461, 465 (D.Md. 2000) (tranfer proper where "key
witnesses" reside in another district); *Continental Airlines,
Inc. v. American Airlines, Inc.*, 805 F.Supp. 1392, 1396 (S.D.Tx.
1992) (movant must designate the key witnesses who will be
called to testify at trial, and make a general statement about
the substance of their testimony or motion should be denied).
Given the gravamen of Plaintiff's complaint, i.e., that
Defendant failed to disclose the existence of certain change
orders relating to work performed on a California project,
inducing it to enter into a lending agreement in California with
Prestige, and that certain change orders were effected and
performed in California without Plaintiff's knowledge or
approval, Defendant's argument that many of the California based

witnesses it identifies are "vital to [its] defense" is persuasive and militates in favor of transfer.

Further, with respect to governing law, it is not at all clear that Maryland law, as Plaintiff asserts, will apply to these claims. In *Cremi v. Brown*, 955 F.Supp. 499 (D.Md. 1997), *aff'd*, 132 F.3d 1017 (4th Cir. 1997), Judge Kaufman recognized that, the "Maryland courts have not yet specifically spoken as to the issue of where the 'wrong' occurs in cases of pecuniary injury resulting from fraud, negligent misrepresentation or commercial negligence, when the alleged wrongful act or omission occurred in one jurisdiction and the 'loss' by plaintiff in another jurisdiction." *Id*. at 522. He concluded that because the Maryland courts are silent as to the applicable rule, "this court must apply a rule which it reasonably believes would be adopted by the highest Maryland court were it to rule on the question." *Id*. (quoting *Uppgren v. Exec. Aviation Servs., Inc.*, 326 F.Supp. 709, 711 (D.Md. 1971)). After reviewing other multi-state tort contexts, Judge Kaufman held that it was reasonable to believe that the Maryland Court of Appeals would adhere to *lex loci delicti* in multi-state misrepresentation cases and that under *lex loci delicti*, the place of the wrong is the place where the alleged misrepresentations or other wrongful

acts took place; not the jurisdiction where the loss was felt. *Id*. at 522-24.

In 2000, three years after *Cremi v. Brown*, the Maryland Court of Appeals, in *Philip Morris Inc. v. Angeletti*, 752 A.2d 200 (Md. 2000), noted that neither the Court of Appeals nor the Court of Special Appeals "has had occasion to discuss the impact of *lex loci delicti* on some of the tort causes of action" and cited Judge Kaufman's *Cremi v. Brown* opinion. *Id*. at 233 n.28. The Court of Appeals, however, did not resolve this issue in *Philip Morris*, as it was not squarely before the court.

Recently, the "issue of where the 'wrong' occurs in cases of fraud, or negligent misrepresentation, when the alleged wrongful act and the alleged loss occur in separate jurisdictions" arose again in this district. Recognizing that "it is unclear what choice of law rule [the court] should apply," and what substantive law would govern the claims, Judge Bennett certified the question to the Maryland Court of Appeals. *Hardwire LLC v. The Goodyear Tire & Rubber Co.*, -- F.Supp.2d --, 2005 WL 638271, at *7 (D.Md. March 18, 2005). In light of the uncertainty as to what substantive law would govern this action, this factor is essentially neutral and does not tilt the balance in Plaintiff's favor.

27

Finally, Defendant asserts that transferring this matter to California is appropriate because there are "currently pending two actions involving the parties and/or the property in California, which are factually intertwined and related to [Plaintiff's] claims in this case." Paper 6 at 23. One action involves Defendant's claim against Plaintiff and Prestige arising out of Prestige's default on the General Contract with Defendant. As Plaintiff itself admits, that case involves the alleged existence of various mechanics' liens that "include an undisclosed number of change orders" which lie at the heart of Plaintiff's fraud, negligent misrepresentation, and breach of contract claims against Defendant. The second case involves Plaintiff's foreclosure action against Prestige, filed "[i]n an effort to mitigate its damages." *See* Paper 2, ¶ 37.

Defendant argues that these California actions relate to and are intertwined with the claims asserted in this action, and that, in light of the fact that Plaintiff is already a party in multiple actions before the California courts relating to the construction project, the Construction Loan Agreement, the Assignment Contract, and the alleged existence of mechanics' liens and change orders, California, therefore, is the most appropriate and convenient forum. The court agrees. Given the substantial connections this case has with California and the

28

uncertainty that this court can even exercise *in personam* jurisdiction over Defendant in accordance with due process, "[Plaintiff's] choice of forum must yield to other interests." *See Joseph M. Coleman*, 887 F.Supp. at 120; *see also Parham v. Weave Corp.*, 323 F.Supp.2d 670, 674–75 (M.D.N.C. 2004) (transferring case despite deference accorded plaintiff's choice of forum where "jurisdiction in [transferee] district is more certain than jurisdiction in [transferor district]" and "[t]ransfer will advance the interests of the parties and the interests of justice better than dismissal and refiling or reversal and retrial"). Accordingly, the court will exercise its discretion to transfer this case to the United States District Court for the Central District of California.

## V.   Conclusion

For the foregoing reasons, the court will deny Defendant's motion to dismiss, but grant the motion for transfer. A separate Order will follow.

                                            /s/

                                   DEBORAH K. CHASANOW
                                   United States District Judge

                                   April 28, 2005